Commonwealth *v.* Chavis, Appellant.

Argued April 14, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

reargument refused June 30, 1947.

*David B. Asbury,* with him *Leroy Humbert,* for appellant.

*Colbert C. McClain,* Assistant District Attorney, with him *John H. Maurer,* District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, May 26, 1947:
This is an appeal from the judgment of guilty of murder in the first degree with the death penalty imposed. Some time between 12:08 A. M. and 12:24 A. M. on May 11, 1946, Francis K. Erhard, aged 24 years, was assaulted and robbed on Morris Street, near Chelten Avenue, Philadelphia. He reached his home, about 330 feet away, and said to his aunt, "a terrific force hit me from behind, and they got my wallet". He was taken to the Germantown Hospital, where he died at 7:30 A. M., May 11th. The police found at the place of the assault a pool of blood and an iron pipe 18 inches long, wrapped in white paper. They also found a trail of blood from the place of the assault to the deceased's home. On June 10th, William Chavis, an ex-convict, aged 21

years, was arrested for this crime. On the day after his arrest, he confessed the crime, first verbally and then in writing. When this case was tried he repudiated the confession and claimed he was at his home, 66 E. Sharpnack St., at the time the crime was committed. He declared that the confession was secured from him by violence at the hands of Lieutenant Kelly and Detective Arthur. After he was found guilty and sentenced and a new trial was refused, he took this appeal.

Detective Harry J. Morris testified in respect to the confession of the defendant. He said that Detective Arthur and he arrested the defendant, who was asleep in the rear of Dykes Bowling Alley, on June 10th. When Detectives Morris and Arthur questioned Chavis on June 11th, they asked him about his work and his living conditions and also asked him where he was on May 10th. He replied: "I realize now why you are questioning me. You are questioning me on account of that student that was hit over the head and robbed in Germantown." He then said that he was home on May 10th listening to a ball game and to a fight on the radio; that his aunt with whom he lived, Mrs. Lilly Davies, was attending a recital by Marian Anderson at the Academy of Music. The detectives learned that Marian Anderson did not sing in Philadelphia on that night. After further questioning Chavis admitted that he had lied about his work and his living conditions. The detectives then confronted him with a memorandum which they had found in his room. On this he had made notations showing the times at which he (a paroled convict) arrived home on different nights. He said he kept up these notations until 11:30 P. M., May 9th. When asked why he had made no notations after May 9th, he replied he "just forgot." When asked why he did not make these notations on May 10th, he hesitated and began to cry. When he ceased crying, he asked: "How much time will I get out of this?" The detectives answered they "couldn't tell him anything about time." Chavis then said that on

May 7th he went into Richman's junk yard and obtained a piece of pipe about 18 inches long. He brought it to his home, took it to his room, and put it in a bureau drawer. When asked why he got the pipe, he said "he intended to rob a person, to strike someone and rob him with that piece of pipe", that he "had thought about it for several days, that he had been out of work and he needed money." On the following day he went to the rear kitchen of his home and obtained a piece of wrapping paper and wrapped it around the pipe. He took the pipe thus wrapped back to his room and kept it there until May 10th. He said that on that night he took the pipe, stuck it down his pants' leg and went out on the street intending to find a victim to rob. He went to the movies on Germantown Avenue and attended the last show. After that he went "west on Chelten Avenue and out Pulaski Avenue." He saw a man who appeared to be well dressed, and "thought that anyone coming out of a railroad station would have money." He followed him on the south side of Chelten Avenue, to the corner of a small street. Then "this young man crossed the street coming toward him on his side of the street, and at the corner there was a building with a brick wall." He followed the man around the corner "and 'took the iron pipe' from his pants' leg" went up behind him and, as he told the story: "I struck the man with a glancing blow at first. I hit him on the side of the skull and stunned him at first. He turned to say something and I hit him again with a full blow on the side of the head around the temple. He dropped to the ground and laid there. I went through his pockets and found his wallet. I took the wallet and started to run away from the scene." Chavis then looked back and saw the man "struggling in the street, or rather, struggling on the sidewalk in the opposite direction from which he was running." However, when he got several blocks away, Chavis took out of the stolen wallet "a ten-dollar bill, two five-dollar bills, and some one-dollar bills." He then threw the

wallet away and continued through various streets to his home, which he reached at about 2 A. M. Chavis then took the detectives to the scene of the crime. They also went to the home where Chavis resided with his aunt at the time of the homicide, and his statement was taken stenographically. Its transcription was signed by him. The detectives testified that all the defendant's statements were made voluntarily and without duress of any kind.

When shown a photograph of the victim, Chavis said: "This looks like the man that I hit on the head and robbed." When shown the galvanized iron pipe, 17 inches long, three-quarters of an inch in diameter, weighing one pound and eleven ounces, with a half ground joint union at one end, which was found at the scene of the crime, Chavis said: "That's the piece of pipe I had when I hit the fellow." When shown a piece of cream colored wrapping paper he said "It looks like the paper that was wrapped around the pipe." When shown the victim's wallet, he said: "It looks like the wallet I took out of the man's pocket when I attacked him and threw away." When asked: "Is there anything else you want to add to this Statement that you have made?", he replied: "The only thing, I am sorry I committed the crime." When Chavis was at the scene of the crime with the detectives he pointed out the spot where he attacked his victim, indicating a point on the east side of Morris Street about 35 feet south of Chelten Avenue and he described the fatal blows. .

Chavis testified that on the night of May 10th he was at his aunt's home in Germantown listening to the radio report of a baseball game which lasted "until about one o'clock, . . . It went 15 innings." He also "listened to a fight over the radio." He said: "I went to bed after the baseball game was off. That would be after one o'clock." He told of his arrest in June by the detectives and his questioning, as follows: "Lieutenant Kelly came in he got up and kicked me right on the shins," and as

he went by Kelly said, "Excuse me." The detective said: "Now, if you come clean with us, we will see that you get a fair break." About 1:30 in the afternoon, Detectives Morris and Arthur asked him further questions, and the former said: "Well, you have had enough time to think it over. You might as well come clean. We know where you were on May 10th. Now you tell us." He answered: "I really don't know." Detective Arthur said: "I am going to hit you with that chair and get you up in that corner and bang your head on it, if you don't come clean with us. . . . Don't you know anything about a man getting clubbed up on Chelten Avenue?" Chavis said he "couldn't figure it out." Morris asked: "Don't you remember reading something in the paper about a fellow getting clubbed up on Chelten Avenue?" Chavis replied: "Yes, I remember reading something in the paper about a fellow getting clubbed up on Chelten Avenue." He was then showed the slip on which he had recorded each night the time of his arrival home and Chavis responded: "I had come in early that night and I went and turned the radio on and listened to the baseball game, and I said I would put it down the next day, which I did, and I forgot it." He said: "I got nervous and I was scared, because I was scared of what they were going to do to me, and I acknowledged . . . That I had hit this man." He testified: "They had me down in Lieutenant Kelly's office and said, 'If you come along with us, everything will be all right. You will get a decent trial and an even break,' and I said, 'Yes, sir.' They said, 'You come along with us,' and I said, 'If I go along with you all, you will see that I get a fair trial?' and they said, 'Yes,' and I told them, 'I didn't do it.' " The detectives then took him "out on this tour." When they got in front of Richman's, they said: "Point out the place about where you got this pipe in Richman's." He was then asked by his attorney: "Had you gotten the pipe from that place?" "A. No, sir, I hadn't. Q. Did you get a pipe from any place? A. No, sir, I didn't." He

admitted that he told the detectives that he hit a man on the head with a pipe with prongs on the end; and when the detectives showed him a picture of a man and asked him, "Do you know this man's face on here?", he said "It looks like him. . . . This looks like the man that I accidentally hit."

In cross-examination he stated that he was paroled from Eastern Penitentiary in December, 1945, where he had served two and a half years on a charge of rape. He was supposed to report to his parole officer on May 26th but he did not do so. He left his home at 66 East Sharpnack Street on May 24th and came downtown to live. He worked in the Jimmy Dykes Bowling Alley. When he worked in the bowling alley he lived in the bowling alley. He admitted he kept a daily timetable of his whereabouts until the 9th of May. After that date he made no notation on the records. He said he "never did it again." He admitted he knew where Richman's junk yard was. It was located three doors away from where he lived in that vicinity. He admitted he read over the 8-page statement he made before he signed it and he made a correction on page 3 by changing the phrase "east on Chelten Avenue" to "west on Chelten Avenue." He also changed the name "Musgrave Street" to make it read "Magnolia Street" in two places. He admitted that he told the detectives that he saw a show at the Colonial Theatre on the night of May 10th and around 11:20 P. M. he came back to Chelten Avenue but he added "All of that is not so." He said: "I was making that up", and he added, "I made up the whole eight pages."

Mrs. Davis, the defendant's aunt, testified that on May 10th she arrived home about 11:15 P. M. and saw the defendant "Sitting down in front of the radio . . . In his room." She saw him again in bed about 1:30 A. M. She claimed she had been "in the house continuously from 11:30 until half-past one."

The Commonwealth called in rebuttal Dr. William Dunbar, who examined the defendant on June 14, 1946. These questions and answers followed: "Was there or was there not any evidence of any recent physical injury?" "A. There was not. Q. Did he make any complaints to you of any physical injury? A. He did not." He said that he looked at the defendant's ankles and leg and examined his entire body and found no marks on the ankles and leg and "There was no evidence of any recent injury." Mr. Floyd D. Mulford, parole officer of the Pennsylvania Board of Paroles, who saw the defendant on June 11th, was asked: "Did he say to you that he had been threatened by anyone or beaten?" He answered: "No." "Q. Or that any violence of any type had been offered to him? A. No." Lieutenant Kelly testified that the defendant was not ill-treated by anyone and made no complaints about threats or violence, that he got up to answer the phone and walked by the defendant and his foot may have come in contact with him. He added: "If my foot came in contact with him at any time it was unintentional and I probably apologized for stepping on his foot or whatever happened as I was trying to get from behind that desk." He said Chavis told him "the only reason that he did talk about this and tell the truth was the fact that he could not stand his conscience. He broke down completely and cried considerably."

The record presented an issue of fact for the jury as to whether or not the confession made by the defendant was a voluntary one and was or was not true. The jury found against the defendant on that issue and convicted him.

Appellant filed 21 assignments of error. The first was based on the refusal of the court to allow counsel a continuance because of lack of time within which to prepare the defense. Counsel was appointed on June 17, 1946. Counsel interviewed the defendant on the following day. He then prepared a "Petition for Leave to Withdraw Plea of 'Guilty' and to Interpose a Plea of

'Not Guilty' ". When first arraigned in this case the defendant pleaded guilty to murder. The case was continued until June 27, 1946. The defendant was then permitted to withdraw his plea of guilty and enter a plea of not guilty.

The case was called for trial 10 days after counsel was assigned to the defendant. In *Commonwealth v. Deni,* 317 Pa. 289, 176 A. 919, the defendant was brought to trial eight days after the homicide with the commission of which he was charged. It was argued in that case that the court below erred in not continuing the case. This court found no error in refusing the continuance and said: "In determining whether a continuance should be granted in any criminal case, the nature of the crime and the circumstances attending it must be considered. The occurrences surrounding a crime, its preparation and execution, may be so involved that more time is required to prepare a defense than where such complicating incidents are not involved. In the latter case a speedy trial could and should be had. In all cases such time should be given for preparation that a charge of undue haste can not be fairly made. The circumstances attending the commission of this crime were not in any way intricate or involved; the ninth day after its commission was not, therefore, an unreasonably short time in which to proceed with the trial, the defendant having been given ample notice that this would be done, and to prepare his case. Defendant was provided every opportunity to produce witnesses, and was permitted to use the processes of the court for that purpose, but he mentioned no witness that he was unable to get, nor does he make such complaint here." We think what the court said in that case is applicable here. We find no warrant for the claim that the defendant was prejudiced by being brought to trial so speedily, though it would have been a sound exercise of judicial discretion if defendant's counsel had been given the continuance they asked for.

The second, third, and fourth assignments of error are based upon the fact that while the panel from which the jury in this case was to be drawn was present, the court below directed that the defendant be brought to the bar of the court and permitted the defendant to change his plea of guilty to not guilty. When on June 27th the defendant was brought before Judge KUN and his counsel asked leave to withdraw his plea of guilty, counsel also requested that the jury panel be taken out of the room. The court refused this motion. Exception was taken. The court said: "Bring the defendant forward to enter his plea of not guilty." The record shows that the court said: ". . . he [the defendant] has just filed a petition before me to withdraw his plea and I gave him leave to withdraw it." Defendant's counsel said: "I take exception to that being said in the presence of the jurors that are here to sit on this case. And I ask for the withdrawal of the entire panel." The motion was refused.

The contention is that it was prejudicial to this defendant for the panel from which four jurors in this case were selected to be thus informed that the defendant had already entered a plea of guilty and was now withdrawing it. Counsel cited Wharton on Criminal Evidence, paragraph 39: "Where a plea of guilty is withdrawn by permission of the Court, it is not binding as confession, nor can it be used as an evidence." Counsel argues that while the plea of guilty was not introduced as evidence it had the probative effect of evidence by being brought to the attention of the panel in the manner indicated.

A judge with due solicitude for the protection of the rights of a defendant charged with a capital crime would have seen to it that the defendant's withdrawal of his plea of guilty would have taken place in the presence of the court with prospective jurors excluded from the room, just as often in the trial of a case the jury is taken out of the courtroom when the admissibility of

certain offered evidence is argued before the trial judge. Does the breach of judicial propriety charged here amount to prejudicial error? Some breaches of judicial propriety do amount to such error and others do not. In the case of *Commonwealth v. Fugmann*, 330 Pa. 4, 18, 198 A. 99, we said:

"There is seldom any criminal or civil trial of any magnitude or duration into the record of which some irrelevant, incompetent and immaterial testimony does not 'creep' and has been subsequently 'stricken out' and the jury instructed to 'disregard it'. To grant new trials whenever such a thing occurred would mean an interminable and intolerable succession of new trials."

In that case we held that the effect of the admission of incompetent testimony was nullified by the subsequent instructions of the trial judge. Likewise, in this case we hold that any possibly adverse effect of the error complained of was nullified by the subsequent instructions of the trial judge, and that in the light of these instructions the presence in the courtroom when the plea of guilty was withdrawn of four persons who were later chosen as jurors did not amount to a denial of this defendant's right to a fair trial. Near the close of the charge the court said: "You are here solely and exclusively to do justice as between the Commonwealth and the defendant based on the evidence you heard in the case . . . are you willing to decide this case solely and exclusively on the evidence that comes from the witness stand, applying thereto the law given to you in the charge of the Court? You said you would and because you said you would you were chosen as jurors. Now see that you do it." There were other instructions of the same tenor. Nothing before us negatives the presumption that the jurors did their duty and decided this case solely upon the evidence that came "from the witness stand." This assignment of error is overruled.

The fifth assignment of error is based upon the admission of the testimony of Dr. Wadsworth, Coroner's

physician of the City and County of Philadelphia, who when shown the 18 inch pipe which the Commonwealth alleged was the weapon used by the defendant was asked if it could have caused the injuries, meaning the injuries received by the victim. The witness answered: "It could." We find no error in the admission of this testimony. We agree with appellant's counsel that "the Jury was sufficiently informed and capable of forming their own opinion as to whether or not the particular pipe, which was found near the scene of the crime, had been used to inflict the injuries causing the homicide, without the aid of an opinion by Dr. Wadsworth", but we do not accept appellant's contention that the admission of Dr. Wadsworth's testimony was prejudicial error. It is obvious to any normal human being that the galvanized iron pipe such as was exhibited in this case as the murder weapon would when wielded with force upon another's head cause death. This assignment of error is overruled.

The sixth assignment is based on the admission in evidence of the victim's clothing. It was argued that this had a tendency to inflame the minds of the jury. The question as to whether or not the bloody clothes of the victim of a homicide should be received in evidence in the trial of the defendant is largely within the discretion of the trial judge. A careful judge will not admit such evidence when it has no relevancy to any issue in the case and when the purpose of its admission is obviously to stir up the emotions of the jurors. In the case of *Commonwealth v. Yeager*, 329 Pa. 81, 196 A. 827, a photograph of the victim was admitted in evidence. We said that this "was a matter within the discretion of the trial judge." We, quoting from *Com. v. Ferry*, 326 Pa. 129, 191 A. 130, said: "Whenever they [photographs of the bodies of victims named in indictments for murder] are received in evidence, the jury should be instructed as to their purpose and cautioned not to permit the photographs to stir up their emotions to a

defendant's prejudice." In the instant case the admission in evidence of the clothes of the victim served no legitimate purpose and such evidence should have been excluded. However, we do not hold its admission to be reversible error.

The seventh assignment of error is based upon the comment of the court while defendant's counsel was questioning the Commonwealth's witness, Mary Nordeman, concerning the finding of the deceased's wallet in a certain restaurant. The court said: "The Commonwealth does not charge that the defendant was in the restaurant that night and threw the wallet there. A woman could have picked it up on the street and then thrown it there because she did not find anything in it. Anything could have happened." This was an argument made by the trial judge. It could have been made with more propriety by the district attorney than by the judge. However, it does not amount to reversible error.

The eighth and ninth assignments of error are based upon the court's "instructing the Jury that, if the defendant killed the deceased in the perpetration of a robbery, he was guilty of murder in the first degree, without defining to them the other degrees of homicide and instructing them that it was their duty to fix the degree of the offense regardless of what was charged in the Commonwealth's Bill of Indictment." At the close of the judge's charge when he asked, "Is there anything I overlooked?", defendant's counsel said: "I think under the decisions it is necessary for your Honor to charge on first degree murder, second degree murder, and even voluntary manslaughter." The judge then charged as follows:

"In addition to first degree murder there is another degree of murder which is called second degre murder. Second degree murder is a case where a man maliciously beats another, not intending to kill him, but the man does die. That would be second degree murder. However, I have to add that where a killing occurs in the course of

the commission of a robbery it is first degree murder, under the law. Now I have given you that. Manslaughter is where a man kills another one, and though intentionally, he does it in the heat of passion, under uncontrollable circumstances, circumstances under which he cannot control himself,—under great passion, great heat, where he momentarily cannot control his actions. That in a few words is voluntary manslaughter.

"It is your duty to fix the degree of the defendant's guilt, if you find him guilty. If you find, under the evidence in the case, that the defendant is not guilty of murder in the first degree and you find that he is guilty of murder in the second degree, that will be your verdict. If you do not believe that he is guilty of either murder in the first degree or murder in the second degree, but he is guilty only of manslaughter, you will find him guilty of manslaughter. If you decide he is not guilty of any crime say, 'Not Guilty.' The responsibility is entirely that of the jury. Does that cover your point? A. Yes; and then I don't know whether you want to tell them about 'wilful, deliberate and premeditated'?"

In *Com. v. Sheets,* 197 Pa. 69, this court said: "An imperative instruction which takes from the jury their right to ascertain the degree is erroneous, but one which points out to them their duty under the law, but leaves them free to act, is not erroneous. These assignments of error are overruled.

The tenth assignment of error is based on the alleged error of the court in "over-emphasis of the evidence produced in behalf of the Commonwealth by constant and repeated and elaborate references thereto, and in neglecting, belittling, disparaging, and failing to properly and fully review the defendant's testimony." The defendant's guilt turned upon the validity of the confession offered in evidence. The trial judge in charging the jury commented at considerable length on what the defendant said about these confessions. The court said:

"He admits making the statements attributed to him, both orally and in writing, he does not deny making the

statements, and in fact, he repeated to a certain extent while he was on the stand, it seems to me, some of the statements that he is alleged to have made at one point or another. He said, 'Yes, that is the point where I told them I just hit the man' and so forth. He was asked, 'Did you make these statements?' to which he replied that he did, but when he was asked, 'Well, were they true?' he said, 'No, they were not true.' 'Why did you make them?' he was then asked, and he said,—and here is the crux of the case again; I have already referred to it in the Commonwealth's case—'I was scared.' "

The court also instructed the jury as follows:

". . . when a man admits a crime, that is the best evidence that he committed it, but the law, with regard to a confession, is that the confession, in order to be valid, must be voluntary. If, in point of fact, the jury decides in any case, or if it decides in this particular case, that this defendant was clubbed, or beaten, or threatened, or put in fear, and he made this detailed statement not because it was true and he was guilty, but because he was afraid of these people, they were threatening him, beating him, as he claimed as to one, he was in fear, and the whole thing was false, then the confession is no good, and there is no case here against the defendant."

The court also instructed the jury as to the defense of alibi which was advanced in behalf of this defendant. The court said, inter alia:

"The defendant himself denies that he was on the scene and he denies having willingly and voluntarily confessed the crime. He claims that at the time of the commission of the crime he was home listening to a ball game on the radio and a fight on another station on the radio. Then his aunt, who has raised him since he was five years of age, was called and she said that on her return from a concert at her church that evening at about 10:30 or eleven o'clock she found the defendant in his room listening to the radio, that he continued to stay in his room there, he never left it, and he was still

there at 1:30 in the morning when she went to bed. If you believe that, then this defendant could not have committed the crime which he confessed in the first instance and later repudiated because he said he was forced. It is just plain common sense that a man cannot be in two places at one time. You have to consider the validity of that testimony and the source from which it comes in order to determine what value it has in the case. How does it stand against all the other testimony in the case? Do you think that is a factual statement, a correct statement, on the part of the witness who testified, or do you think it was induced by her great love and affection and concern for the boy who was in effect her child? We cannot look into the minds or the mental operations of any human being, but she, and she only, testifies to that fact, in support of the defendant. You must decide the matter."

The court's further instruction as to defense of alibi was adequate. The tenth assignment of error is overruled.

The eleventh assignment of error is based on the following excerpt from the court's charge: "You do not have to look for elements of intent, deliberation, premeditation, and all such elements that are necessary to prove first degree murder. If a death occurs during the commission of certain felonies,—felonies are the more serious types of crime—that is, by law ipso facto murder in the first degree." This was substantially in accord with the Act of June 24, 1939, P. L. 872, 18 PS 4701, which declares, inter alia:

"All murder which shall be . . . committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree."

This assignment of error is overruled.

The twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, and nineteenth assignments of error are based upon excerpts from the charge

of the court. We find no substantial error in any of them. A charge must be considered in its entirety and if on the whole it could not have misled the jury into returning an unjust verdict, reversible error will not be predicated upon it. This court said in *Com. v. Schurtz*, 337 Pa. 405, 411, 10 A. 2d 378: "Isolated excerpts torn from the heart of the charge cannot be considered apart from the context."

The twentieth assignment of error is based on the refusal of defendant's motion for a new trial. It is overruled.

The twenty-first assignment of error is based upon the entry of judgment and sentence. It is overruled.

The killing of Francis K. Erhard was malicious and brutal. It was a clear case of murder in the perpetration of a robbery and, therefore, it was murder in the first degree. The appropriate penalty for the robber-assassin to pay is the penalty imposed. The defendant's confession bears the impress of being that of the man who actually perpetrated the murder; it does not read like the narrative of someone who merely imagined he committed a murder or like the involuntary utterances of a man obsessed with fear. The defendant pointed out the spot where he got the club and where the crime was committed, and when shown the club and the victim's wallet he said they "looked like" the club he used and the wallet he stole. His claim that his confession was extorted from him by force and threats was contradicted by the testimony of the officers who questioned him. It is also significant that to those who saw him immediately after his questioning he made no complaints as to any abuse and that his body bore no evidence of violence. The jury was justified in adjudging the defendant's confession to be true. By his own statement he revealed himself as a murderer fully deserving the penalty of death.

Judgment is affirmed; the record is remitted to the court below so that the sentence imposed may be carried out.