425 A.2d 757

**COMMONWEALTH of Pennsylvania**

v.

**Jack Bernard PIFER, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 4, 1979.

Filed Jan. 30, 1981.

Petition for Allowance of Appeal Denied July 16, 1981.

H. Stanley Rebert, Public Defender, York, for appellant.

Richard H. Horn, Assistant District Attorney, York, for Commonwealth, appellee.

Before HESTER, MONTGOMERY and CIRILLO, JJ.*

* Judge VINCENT A. CIRILLO of the Court of Common Pleas, Montgomery County, Pennsylvania, is sitting by designation.

MONTGOMERY, Judge:

On January 23, 1978, appellant was convicted, after a jury trial, of attempted murder, rape, involuntary deviate sexual intercourse, aggravated assault, and recklessly endangering another person. Timely post-trial motions were filed and denied. Appellant was sentenced to undergo imprisonment for not less than 25 years nor more than 50 years at a state correctional institution. A petition for reconsideration of sentence was dismissed on February 20, 1979. This appeal ensued. We affirm.

The facts leading to prosecution in this case are as follows:

On July 13, 1977, at approximately 5:00 P.M., nineteen year old Penny Dietz was sitting on the steps of a church in York, Pennsylvania, waiting for her husband. Appellant opened the church door and invited the victim into the church. When Mrs. Dietz stepped inside, appellant began to choke her, saying "I'm going to kill you, then rape you." In the course of struggling with him, the victim and the appellant fell down a nearby stairway. Appellant then produced a single edged razor and slashed the side of the victim's throat twice, causing two four-inch wounds. Although he missed severing her jugular vein by 1/16th of an inch, as a consequence of the wounds he inflicted, the victim lost 50% of her blood during the ordeal. The appellant then dragged her into a large basement area and undressed her. He continued to choke her, and finally he raped her. At one point, he inserted his fingers into the wounds on her neck, and later, committed involuntary deviate sexual intercourse. Although the victim remained conscious the entire time, she feigned death. When her assailant momentarily left the room, she fled naked out the back door of the church to a nearby home. The police apprehended the appellant minutes later inside the church.

Appellant raises more than a dozen issues in his appeal, none of which have any merit. The first five issues concern the insanity of the appellant. Essentially, appellant contends that the Commonwealth failed to present sufficient

evidence of sanity from which the jury could find appellant legally responsible for his criminal acts.

When there exists circumstances which raise the issue of insanity, the burden is upon the Commonwealth to establish appellant's sanity beyond a reasonable doubt. See *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976); *Commonwealth v. Tyson*, 485 Pa. 344, 402 A.2d 995 (1979); *Commonwealth v. Delker*, 467 Pa. 305, 356 A.2d 762 (1976). It is unrefuted by the Commonwealth that the pretrial examinations as to appellant's mental health sufficiently shifted to the Commonwealth the burden of proving sanity. The definition in Pennsylvania for insanity is the M'Naughten test. If the appellant either did not know the nature and quality of his act or if he did not know that it was wrong, then he is legally insane. *Commonwealth v. Hamilton*, 459 Pa. 304, 329 A.2d 212 (1974); *Commonwealth v. Demmitt*, 456 Pa. 475, 321 A.2d 627 (1974). In describing this test, the Pennsylvania Supreme Court noted that:

"It is not intended to separate the emotionally disturbed defendants from the emotionally healthy. Rather, it is intended to include defendants, both disturbed and healthy, among those who are held criminally responsible . . ." *Commonwealth v. Demmitt*, supra, 456 Pa. at 481, 321 A.2d at 631.

Thus, findings of mental illness alone do not necessarily mean that a defendant is legally insane. *Commonwealth v. Bruno*, supra. At least one of the above mentioned prongs of the M'Naughten test must be established in order to be considered legally insane. Conversely, in order for the Commonwealth to sustain their burden of proving appellant was sane, they must prove that appellant did know the nature and quality of his act and did know that it was wrong.

An examination of the record reflects that the Commonwealth introduced expert testimony from Dr. George A. Lapes, a psychiatrist who examined the appellant six months after the crime occurred. After testifying that he had discussed the facts of this case with the appellant, Dr. Lapes expressed the opinion that, based upon the way appellant

described the events in question, appellant did know the difference between right and wrong and that he did know the nature and quality of his acts at the time he committed them:

> (Dr. Lapes) "I asked him if he knew whether he would be in trouble by what he did and he indicated, yes, but that he didn't care. And I asked him what he was trying to do and we went into details of the act and he indicated that he intended to kill the victim and that when the lacerations he inflicted did not do the job he used his fingers to try to hasten the process. I feel it's very reasonable that he knew what he was doing and what he was trying to accomplish. To me that means he knew the nature and quality of his acts and he knew that they were wrong."

This expert's opinion of appellant's sanity was supported by the testimony of the police officers who apprehended appellant at the scene of the crime. Detective Dennis R. Smith, of the York City Police, was interrogating the appellant inside the church immediately after the crime and was told by appellant that he had been "jumped" by two negro males who were attacking the victim and who subsequently beat him up when he went to her aid. This fabricated story indicated an attempt on the part of the appellant to escape the consequences of his actions. After his arrest, the appellant made numerous statements to the police acknowledging that he was in a lot of trouble and would get of lot of time for his actions. He also stated that he wanted to apologize to the victim for what he did to her. These statements by the appellant reflect a recognition on his part of the serious nature of his crimes, and that they were wrong.

■ The defense introduced expert testimony from Dr. Harry Stamey that the appellant was suffering from a psychosis and was so disassociated from reality as to be unable to comprehend the nature and quality of the thing he was alleged to have done. Although appellant argues that this testimony establishes his insanity as a matter of law, it is well-settled in this jurisdiction that "[p]sychiatric testimony, like any other evidence is for the trier of fact to consider

and to determine what weight it should be given." *Commonwealth v. Whitfield*, 475 Pa. 297, 302, 380 A.2d 362, 364 (1977). See also, *Commonwealth v. Hicks*, 483 Pa. 305, 396 A.2d 1183 (1979). In the instant case, the jury rejected appellant's theory of insanity as outlined in his expert's testimony.

■ Based upon all of the evidence submitted herein, the jury concluded that appellant was legally responsible for his actions. Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we are satisfied that sufficient evidence existed to support the jury's rejection of insanity as a defense.

■ Appellant additionally alleges prejudicial error by the lower court in ruling that he was competent to stand trial. In order for an accused to be considered competent to stand trial, he must evidence "an ability to comprehend his position as one accused of murder and to cooperate with his counsel in making a rational defense." *Commonwealth ex rel. Hilberry v. Maroney*, 424 Pa. 493, 495, 227 A.2d 159, 160 (1967). Only if a finding of competency is unsupported by the record will it be reversed on appeal. *Commonwealth v. Kennedy*, 451 Pa. 483, 305 A.2d 890 (1973); *Commonwealth v. Tyson*, supra.

■ On November 15, 1977, approximately two months before trial in this case, appellant was found to be competent to stand trial by the Honorable Albert G. Blakey, III, of the Court of Common Pleas of York County. A period of two months between a competency hearing and trial is not so long a time as to necessarily render that determination irrelevant to appellant's mental status at the time of trial. See *Commonwealth v. Harper*, 479 Pa. 42, 387 A.2d 824 (1978) (twenty months between competency hearing and trial was too long). Since the lower court's finding of appellant's competency to stand trial is not per se unreliable, we must review the record for any indication that appellant was unable to comprehend his position as one accused of a crime and was unable to assist his counsel in presenting a rational defense.

In his brief on this issue, appellant cites no specific instances in the course of his trial to illustrate his alleged incompetence. As the lower court observed in its opinion:

"[t]he defendant has no right, however, to an endless series of competency hearings absent a change of defendant's condition, defendant's counsel did not set forth or acquaint the court with any new facts showing a change in defendant's mental condition since the adjudication by Judge Blakey."

■ Appellant does refer the attention of this court to proceedings before the Honorable Guy A. Bowe on January 9, 1978 during which defense counsel sought a continuance which was agreed to by the Commonwealth. At that time, appellant voiced his opposition to any delay and a desire to proceed to trial immediately so as to "get it over with." Such a concern in and of itself fails to persuade us that appellant was incompetent or that the lower court committed error by relying upon the prior judicial determination of competency. In fact, at trial appellant's counsel admitted to the trial judge that his client understood the charges and the nature of the proceedings. We are convinced that the record is sufficient to show that appellant could consult with his attorney and did understand the nature of the charges and the proceedings against him.

Next, appellant contends that the court erred in permitting the victim to examine her blood-soaked clothing in the presence of the jury. While it is true that the victim was asked to identify her shorts, shirt, and bra, and that these exhibits were later denied admission, appellant fails to mention that these articles were viewed in a packaged state by the victim. Thus, it appears from the record that the jury was not given the opportunity to observe the clothing, and therefore, no prejudice inured to the appellant.

■ The next point of error which appellant advances is the victim's in-court identification of the appellant as her assailant. In this case, no preliminary hearing was held and there was no prior pre-trial identification. While we readily admit that a one-on-one identification of a defendant in the

context of a judicial proceeding is inherently suggestive, it is concomitantly well-settled that any taint resulting from such a viewing can be negated in certain cases. Specifically, if the prosecution establishes by clear and convincing evidence that the totality of the circumstances affecting the witness' identification did not involve a substantial likelihood of misidentification, *Commonwealth v. Fowler*, 466 Pa. 198, 352 A.2d 17 (1976), then the in-court identification must be deemed reliable. Herein, the victim had the unfortunate opportunity of viewing the appellant at the time of the ordeal for almost an hour and she demonstrated a positive and unwavering certainty of his identification at the confrontation at trial. As the Supreme Court noted in *Neil v. Biggers*, 409 U.S. 188, 201, 93 S.Ct. 375, 383, 34 L.Ed.2d 401 (1972) of a rape victim's subsequent identification, she "was no casual observer, but rather the victim of one of the most personally humiliating of all crimes."

Moreover, it was uncontroverted that the assailant made no effort to conceal his features. Rather, his initial contact with the victim was a polite invitation into the church. Appellant never requested a pre-trial line-up, unlike the defense counsel in *Commonwealth v. Sexton*, 246 Pa.Super. 30, 369 A.2d 794 (1977), rev'd. 485 Pa. 17, 400 A.2d 1289 (1979), upon which appellant relies. This case does not involve the situation where the victim had a mere glimpse of the actor. Mrs. Dietz's ability and opportunity to observe the appellant during the attack more than sufficiently establish an independent basis upon which her in-court identification was based. Therefore, again we find no merit to appellant's allegations of prejudice.

 Appellant argues that, of the exhibits which were admitted, nine were either so inflammatory as to prejudice the jury against the defendant or they had no probative value, and the lower court consequently abused its discretion in allowing them into evidence. The admission of evidence falls clearly within the discretion of the trial judge. See *Commonwealth v. Ford*, 451 Pa. 81, 301 A.2d 856 (1973). The test to be applied in determining the admissibility of

such evidence involves weighing the inflammatory nature of this evidence against its "essential evidentiary value." *Commonwealth v. Martinez*, 475 Pa. 331, 336, 380 A.2d 747, 750 (1977) (citing cases).

After carefully reviewing the record, we cannot say the trial court abused its discretion in assessing the balance of these exhibits in favor of admissibility. Five exhibits, the victim's underwear, the appellant's pants, shirt, underwear, and handkerchief had traces of blood on them, according to Detective Gohn, who removed swatches of the material for tests on the blood stains. The appellant advances no reason as to why the presence of dried blood on an item of real evidence necessarily renders it inflammatory. We are not convinced that these exhibits were introduced solely to stir the emotions of the jurors against the appellant. See *Commonwealth v. Chavis*, 357 Pa. 158, 53 A.2d 96, cert. denied, 332 U.S. 811, 68 S.Ct. 104, 92 L.Ed. 389 (1947). These exhibits were relevant to show that they were, in fact, the victim's and appellant's clothing, where they were found, and the position with respect to each other.[1] Furthermore, appellant's underwear contained his name printed on the waistband. Evidence tying appellant to the scene of the crime is overwhelmingly probative and far outweighs whatever prejudicial effect blood spots may have had on the jury. The trial judge did deny the admission of several exhibits on the basis that they were thoroughly blood-soaked and would be highly inflammatory. In light of the conscientious attention with which the lower court treated all of the exhibits, we are confident that its use of discretion with respect to these admitted exhibits was also judiciously exercised.

The introduction of a razor blade and scissors are also claimed to be prejudicial by appellant because each bore blood stains. However, as we stated above, any prejudice stemming from these items was overshadowed by the essential evidentiary value of the potential crime weapons, especially in light of the police officer's testimony that appellant

1. Appellant's underwear was found directly on top of the victim's underwear.

pointed to where the razor was located immediately upon apprehension. Appellant's final two objections are directed at a photograph of the scene of the crime, and appellant's fingernail clippings which had traces of blood thereon. Neither of these were so inflammatory as to be prejudicial to the jury, but were relevant to the instant case.

Another issue raised by appellant is the voluntariness of the statements he made to the police subsequent to receiving the *Miranda* warning. Essentially, appellant argues that his deprived background and mental deficiencies rendered all of his statements involuntary, and, hence, inadmissible. The Supreme Court has specifically rejected just such a claim in *Commonwealth v. Tucker*, 461 Pa. 191, 335 A.2d 704 (1975). Therein, the Supreme Court held that the fact that the appellant was a psychopath and a mild mental defective was insufficient, in and of itself, to render his confession involuntary. Rather, the totality of the circumstances surrounding the giving of the statements being challenged must be reviewed. *Clewis v. Texas*, 386 U.S. 707, 708, 87 S.Ct. 1338, 1339, 18 L.Ed.2d 423, 426 (1967).

Herein, the *Miranda* warnings were administered to the appellant several times, with the police and detectives repeatedly questioning him as to his understanding of his constitutional rights. However, the appellant, immediately after being so informed, began to offer his account of the occurrence. Further, while in the process of obtaining bail, he stated in a telephone conversation with his mother that he had just raped a girl and cut her throat. We find that appellant was fully capable of understanding his situation, and was capable of voluntarily waiving his rights. Thus, his statements were properly admissible.

Appellant next alleges prejudice at trial by the Commonwealth's reference to a medical opinion which was not properly admitted into evidence. At the time, a proper objection was made by appellant's counsel, as well as a request for a mistrial. The objection was sustained with cautionary remarks directed to the jury, but the motion for mistrial was denied. It is this denial of a mistrial to which appellant attributes prejudicial error.

 In reviewing a denial of a mistrial motion on appeal, it is well-settled that the rulings of the lower court will only be reversed if there exists a flagrant abuse of discretion. *Commonwealth v. Farrell*, 265 Pa.Super. 41, 401 A.2d 790 (1979) (citing cases). In measuring the trial court's actions against this standard, we must determine if the alleged occurrence was so prejudicial to the appellant so as to have deprived him of a fair and impartial trial. *Commonwealth v. Goosby*, 450 Pa. 609, 301 A.2d 673 (1973). *Commonwealth v. Frank*, 263 Pa.Super. 452, 398 A.2d 663 (1979).

 Herein, when the prosecutor was questioning the defense psychiatrist, he referred to an expert opinion which was not in evidence. However, this opinion did not go to the ultimate issue of appellant's sanity under the M'Naughten test. Instead, it referred to the out-of-court psychiatrist's finding that appellant was not psychotic. Such an opinion had already been articulated at great length by the prosecution's expert. Hence, this remark by the prosecutor was merely repetitive and was not so prejudicial as to deny the appellant a fair and impartial trial. Furthermore, whatever minimal prejudice the prosecutor's remark may have engendered was harmless in light of the subsequent curative instructions from the court. See *Commonwealth v. Ashmore*, 266 Pa.Super. 181, 403 A.2d 603 (1979). The mistrial was therefore properly denied.

In appellant's final issue in this appeal, he argues that his sentence was manifestly excessive in that the maximum possible punishment was imposed for each offense for which he was convicted. Furthermore, he contends that the crimes of rape and involuntary deviate sexual intercourse merged, and the crimes of criminal attempt to commit murder and aggravated assault merged, for sentencing purposes.

 The test of whether one criminal offense merges into another is whether "... one crime necessarily involves another ..." *Commonwealth ex rel. Moszczynski v. Ashe*, 343 Pa. 102, 104, 21 A.2d 920, 921 (1941), that is, whether all essential elements of the lesser offense are included in the

greater offense. *Commonwealth v. Ackerman*, 239 Pa.Super. 187, 361 A.2d 746 (1976). Appellant initially contends that his action of inserting his penis into the victim's mouth was "necessarily involved" with the crime of forcible rape because it was merely a successive step in one crime. In support of this argument, appellant reasons that the same elements of both rape and involuntary deviate sexual intercourse must be proven for each conviction. In order to reach this result, appellant urges us to consider a statutory interpretation of the crimes of rape and involuntary deviate sexual intercourse. Rape is defined as:

"sexual intercourse with another person not his spouse by forcible compulsion."

18 Pa.C.S.A. § 3121, Act of December 6, 1972, P.L. 1482, No. 334, § 1, effective June 6, 1973. Sexual intercourse is defined as intercourse per os or per anus, in addition to its ordinary meaning, 18 Pa.C.S.A. § 3101, Act of December 6, 1972, P.L. 1482, No. 334, § 1, effective June 6, 1973. Thus, he argues that "rape" could now include the act of oral sex, or anal sex, according to the statutory definition of sexual intercourse.

While there may be a literal logic to appellant's contention, by so holding, we would be rendering the involuntary deviate sexual intercourse statute, for the most part, mere surplusage. This we have already refused to do. In *Commonwealth v. Romanoff*, 258 Pa.Super. 452, 392 A.2d 881 (1979) we stated:

"We are not impressed by appellant's refusal to acknowledge that deviate sexual intercourse differs from sexual intercourse, as it is considered in its ordinary meaning, because of its aspect of deviateness. What may be an ambiguity in the definitions of actions made criminal will not cloud our applying common sense understanding to the facts." 258 Pa.Super. at 262, 392 A.2d at 885.

Thus, we once again hold that the language defining the crime of rape refers to sexual intercourse in its ordinary meaning. By forcibly placing his penis in the victim's vagina, appellant committed the crime of rape, and by forcibly

engaging in oral sex with the victim, he committed involuntary deviate sexual intercourse. Appellant's actions constituted two separate and distinct crimes, and he was therefore properly charged with both rape and involuntary deviate sexual intercourse.

Secondly, we must disagree with appellant's contention that the charge of criminal attempt to commit homicide merges with aggravated assault. The slashing of the victim's throat supports the charge of attempt to commit homicide, while the appellant's other acts upon the person of the victim, i. e., the choking and lacerations found upon other parts of her body adequately fulfill the statutory requirements of aggravated assault, i. e., attempting to cause serious bodily injury to another under circumstances manifesting extreme indifference to human life. The crimes for which appellant was convicted all required proof of separate and independent elements. Sentences upon each conviction were proper, and under the heinous and vicious facts of this case, well within the discretion of the lower court.[2]

Judgment of sentence affirmed.

---

2. Appellant had a lengthy prior criminal record which involved serious crimes similar in nature to the ones presently before this court.