459 A.2d 777

COMMONWEALTH of Pennsylvania

v.

**James Curtis SMITH, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 6, 1982.

Filed April 15, 1983.

Petition for Allowance of Appeal Denied July 21, 1983.

140

Gary Spohn Fronheiser, Assistant Public Defender, Reading, for appellant.

Charles M. Guthrie, First Assistant District Attorney, Reading, for Commonwealth, appellee.

Before SPAETH, CAVANAUGH and MONTEMURO, JJ.

MONTEMURO, Judge:

Appellant, James Curtis Smith, was convicted in a jury trial of second degree murder,[1] rape,[2] indecent assault,[3] involuntary deviate sexual intercourse,[4] robbery,[5] theft,[6] and conspiracy.[7] Post-verdict motions were heard and denied and a sentence of life imprisonment imposed. A timely appeal was taken to this court.

The charges arose out of the brutal slaying of William Eich, Jr., an eighteen year old army private who was home in Reading on a three day pass from Aberdeen, Maryland.

1. 18 Pa.C.S.A. § 2502(b).

2. 18 Pa.C.S.A. § 3121.

3. 18 Pa.C.S.A. § 3126.

4. 18 Pa.C.S.A. § 3123.

5. 18 Pa.C.S.A. § 3701.

6. 18 Pa.C.S.A. § 3921.

7. 18 Pa.C.S.A. § 903.

144

On October 7, 1978, Eich arrived home in the afternoon. At approximately 5:00 P.M. he borrowed the family car, an orange 1972 Volkswagen square-back station wagon, and left "to go to the movies." He picked up two friends, Karim O'Connor and Ricky Curry. Eich also picked up one Darryl Carter.[8] They proceeded to the Maple Bar in Reading. Carter, being the only one of the four over twenty-one years of age, purchased two eight-packs of Miller beer and two six-packs of Old Milwaukee beer. Carter purchased the beer with a twenty dollar bill provided by Eich.

They went to a cemetery to drink the beer and smoke marijuana. Carter forced O'Connor and Curry to leave the car for an undisclosed reason while at the cemetery. They returned to the car and all four left the cemetery. O'Connor and Curry were dropped off at Carter's insistence between 9:00 and 9:15 P.M. Both boys testified that Carter hit or attempted to kick Eich while they were in the vehicle. O'Connor also testified that he had been punched by Carter.

Subsequently, Eich and Carter picked up the appellant who was hitchhiking on Carsonia Avenue in Reading. The appellant was acquainted with Carter but did not know Eich. According to the appellant's uncontradicted testimony he had been at his girlfriend's house all day. Upon leaving, about 7:00 P.M., he waited for a bus to take him to his apartment. It was a cold evening and appellant drank a pint of "Amaretto" and smoked three "bones," that is, marijuana cigarettes. The bus did not come so he went back to his girlfriend's where he remained for about forty-five minutes to an hour. He then left again and commenced hitchhiking until he was picked up by Carter and Eich. The appellant testified that they offered him more marijuana, which he initially declined but later might have accepted. He was also offered a beer or "[M]aybe more, three, I'm not sure," which he drank.

8. Carter pled guilty in Dauphin County to multiple charges arising out of this incident.

The three of them drove to a deserted location on a "powerline road" in Ruscombmanor Township. Sometime between the hours of 9:15 and 11:00 P.M., Eich was brutally beaten to death and sexually assaulted.[9]

The appellant's version of the story is that, as a result of the combined effect of the amaretto, beer and marijuana, he was intoxicated and had fallen asleep in the back of the vehicle. He awoke briefly when he heard Eich and Carter arguing about a road. They went up the road and stopped. Carter asked the appellant for his belt "to bang up some crank." (to use as a tourniquet to aid in injecting speed). Eich and Carter left the car and the appellant handed them trash (bottles, cartons) and then went back to sleep. Appellant then testified that Carter came back shook the appellant awake and returned his belt, which was broken. The appellant noticed this and took the belt off and put it on the floor. Carter told the appellant that Eich was staying with friends and had lent the Volkswagen to Carter.

The Commonwealth disputes the appellant's version of the events. While offering no direct evidence of what happened, they attempt to demonstrate the appellant's participation through circumstantial evidence. They offered the testimony of a chemist that blood stains found on the vehicle were of the same blood type as William Eich's.[10] They offered testimony of the officers who discovered the

9. The cause of death was found to be internal exsanguination, that is to say, internal bleeding. The bleeding resulted from the severe beating that was administered causing the ribs to break and puncture several internal organs, including the lungs and liver. There was also testimony that the victim's neck sustained contusions as a result of a flexible ligature; possibly a belt. The medical examiner also testified that there was an indentation in the anus of approximately an inch and a half in diameter and extending inward approximately one and a half to two inches. This indentation was caused by penetration of a smooth blunt object close to the time of death.

10. The testimony of the chemist was inconclusive as to three samples taken inside the vehicle. One was found not to be blood. Two others could not be identified as human blood. The only stain positively identified as human blood of Eich's type was found outside the vehicle on the ledge above the driver's door.

146

body [11] regarding the positioning of the body some thirty feet off a path in a tangle of weeds, and the positioning of objects found proximate to the body including Darryl Carter's wristwatch, the appellant's belt "keeper", and two beer cartons and a beer bottle on which appellant's fingerprints were found. Additionally, one of the officers testified to scratches he received from the weeds on the backs of his hands. Similar scratches were observed on the appellant. The Commonwealth's theory was that the attack on Eich commenced inside the vehicle and was completed outside. The body was then dragged into the weeds, whereupon appellant and Carter fled.

The Commonwealth also relied a great deal on events subsequent to the criminal incident. Carter and appellant drove to Carter's mother's residence and then to Carter's own residence where they picked up clothing. He told appellant they were going to California, although the appellant stated that he thought they were merely going to drive around. They proceeded to the appellant's apartment where he picked up a jacket and a tape deck. While returning to the car, he saw Carter throwing something in the sewer.[12] They were seen by a gas station attendant, between 10:30 and 11:00 P.M., who was suspicious of their manner and thought they might have stolen the vehicle. They drove through the night, Carter driving,[13] the appellant sleeping. They turned around in "Illinois" and returned, picking up a hitchhiker, Frank L. Mays, outside of Cleveland.[14] Mays drove all the way back to Reading with

11. The body was discovered by State Troopers acting pursuant to information supplied to them by Darryl Carter, who directed them to the location of the body.

12. This later turned out to be Eich's wallet and appellant's belt which were recovered by the police when the appellant led them to the sewer after he was picked up for questioning on October 12, 1979.

13. It appears from the testimony that Carter was the only party to drive the vehicle. The appellant indicated that he had no driver's license and that the only vehicle he had ever driven was a tractor.

14. The appellant's statement introduced by the prosecution indicated that they turned around at appellant's insistance.

them. Once in Reading, Carter met his brother in a gas station, took his belongings and departed. The appellant then sold the car to Mays for ten dollars and signed a receipt using the name, William Eich.[15] Mays drove the car to his home in New Jersey and then called William Eich, Sr.

Mr. Eich and a Police Officer Phillips picked up the vehicle and showed a photographic array of approximately fifteen pictures to Mays. Mays identified Carter and the appellant.

On October 12, 1978, the appellant was picked up for questioning by Chief Wells of the Lower Alscace Police Department and Trooper Goetz of the Pennsylvania State Police. They administered Miranda [16] warnings and asked if he had any information concerning Eich, who was then considered a missing person. He was also told that a murder investigation might result. They drove the appellant to his apartment and the appellant directed them to the sewer where they found the wallet and the belt. The appellant was taken to the State Police Barracks to make a statement about Carter disposing of the objects in the sewer. At this time Smith requested an attorney and a call was made to the Public Defender's Office. There was no attorney available at that time but the appellant was instructed not to say anything.

The parties dispute what occurred next. The appellant contends that in response to questioning he stated, "I can show you where the body is." The prosecution contends that the appellant merely blurted out the statement. After making the statement; the appellant took the police to several locations, including the "power-line road" (which he said did not look familiar), but they did not locate the body. Later that evening, pursuant to Darryl Carter's informa-

15. When Mays inquired about the appellant's authority to sell the car, the appellant stated, "I'm a good boy. I don't need my father's permission to sell the car."

16. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tion, the mangled body of William Eich was found. Smith was immediately arrested and charged.

The Commonwealth also relied heavily on statements made by the appellant, in addition to those we have previously mentioned. While awaiting trial in prison, the appellant made a request to speak with his probation officer. Following a recount of the events of October 7, during which the appellant frequently broke into tears, the appellant stated, "I didn't know that I had, you know, Billy was dead. I thought Bill was still living." The prosecution also brought out two prior statements of the appellant, made before his arrest to his probation officer—each giving a different version of the events of October 7.[17]

The appellant raises several issues herein: That his Sixth Amendment right to counsel was violated due to different representation at the preliminary hearing and at trial; That the trial court erred in admitting prejudicial and inflammatory materials; That the trial court erred in allowing the testimony of an unqualified expert witness; That the trial court erred in denying appellant's motion to suppress; That the trial court erred in refusing to grant appellant's demurrer; and that the evidence was insufficient to sustain the verdict. We will address these claims *seriatim*.

Appellant contends he was denied effective representation by having different counsel at the preliminary hearing and at trial. In all, appellant was represented by three attorneys, each one a member of the Berk's County Public Defender's Office. One, Anthony B. Reardon, III, Esq., represented the appellant at the preliminary hearing and later petitioned the court to withdraw. Another, George C. Yatron, Esq., represented appellant briefly. Finally, appel-

17. In one story, appellant stated he had been picked up hitchhiking by an elderly woman and dropped off at his home where he remained all night and the next day. In the other, he stated he was picked up hitchhiking, bought the car for ten dollars, and then sold the car to a second hitchhiker for five dollars. The obvious import the Commonwealth was trying to convey was that the appellant knew of, and had participated in the crime, and also that he was attempting to conceal his participation with false stories.

lant's present counsel, Gary S. Fronheiser, Esq., began his representation prior to trial and has continued through this appeal.

■ The appellant does not assert any specific prejudice has resulted from the fact of different representation. Instead he attempts to create an implication that such prejudice must necessarily result. We cannot subscribe to this view. In *Commonwealth v. Kahley*, 467 Pa. 272, 356 A.2d 745 (1976), the Supreme Court held:

> While we have held that an accused is guaranteed the right to counsel, *Moore v. Jamieson*, 451 Pa. 299, 307, 306 A.2d 283, 287 (1973), we have never required that the same counsel must represent the defendant at each stage of the proceedings. Absent any demonstrable prejudices because of the change in counsel, we cannot find that [the defendant's] right to the effective assistance of counsel [has] been violated.

*Id.*, 467 Pa. at 286, 356 A.2d at 752. Therefore, we find that the appellant was not denied the effective assistance of counsel in this respect.

Appellant claims that the trial court erred in allowing prejudicial and inflammatory materials to be viewed by the jury. Specifically, he objects to Commonwealth Exhibit No. 4, a chart displaying an ink figure of the victim's body and the objects found in the proximate area, and Commonwealth Exhibit No. 14, a black and white photograph of the victim's body lying where it was found, and showing the disarray of his clothing and bloody, beaten face.

■ It is well settled that the admission of such evidence is a matter within the discretion of the trial judge, and absent an abuse of discretion there is no reversible error. *Commonwealth v. Garrison*, 459 Pa. 664, 331 A.2d 186 (1975); *Commonwealth v. Scaramuzzino*, 455 Pa. 378, 317 A.2d 225 (1974); *Commonwealth v. Woods*, 454 Pa. 250, 311 A.2d 582 (1973). In *Commonwealth v. Scaramuzzino, supra,* the Supreme Court reiterated the standard by which such materials are evaluated:

The proper test to be applied by the trial court in determining the admissibility of photographs in homicide cases is whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. *Commonwealth v. Powell*, 428 Pa. 275, 278–279, 241 A.2d 119, 121 (1968). Such photographs will not be excluded merely because they are horrid or gruesome. *Commonwealth v. Snyder*, 408 Pa. 253, 257, 182 A.2d 495, 496 (1962), but the more inflammatory the photograph, the greater the need to establish the evidentiary value.

*Supra* 455 Pa. at 381, 317 A.2d at 226.

■ In the present case, Exhibit No. 4, the chart, was used by the Commonwealth to aid in clarifying the testimony of State Police Trooper Robert Seese, regarding the position of the body and the objects found in close proximity; *i.e.*, the wristwatch, the belt keeper, the beer cartons and beer bottle. This evidence was important to the Commonwealth's attempt to establish the appellant's participation in the crime by showing objects associated with appellant in close proximity to the victim's body. The chart was essential to the understanding of the factual testimony of the trooper. Furthermore, the ink drawing is not the sort of horrid, gruesome representation which usually draws the close scrutiny of the courts.

■ Commonwealth Exhibit No. 14, the black and white photograph was introduced by the Commonwealth, and admitted by the court, to demonstrate the brutality of the beating as evidence of the intent to kill. In *Commonwealth v. McCutchen*, 499 Pa. 597, 454 A.2d 547 (1982), the Supreme Court reversed this court's grant of a new trial based on the admission of inflammatory photographs. One of the photographs was a color slide of the body of the victim showing the injuries sustained including,

one large bruise of the right eye, across the cheek area, extending down to and toward the lips and side of the jaw; one above the left eye socket, being a blunt impact

injury which produced a gaping wound; one across the top of the head, also a blunt impact injury which produced a larger gaping wound; and injury to the mouth resulting in the loss of several teeth.

*Id.* 499 Pa. at 601, 454 A.2d at 548-49. The Supreme Court found that the pictures helped establish the brutality of the beating and supported an inference of the intent to kill, and thus the value exceeded the prejudicial impact upon the jury. A factor present in *McCutchen,* which is also present in this case, is that the photographic evidence constituted virtually the only evidence regarding the intent to kill. An additional factor emphasized by the Supreme Court was the cautionary instruction given by the trial judge, a charge comparable to that given by the trial judge herein. While the admission of explicit and gruesome photographic evidence will always raise judicial concern because of the impact such evidence has on a jury, there are instances where the prosecution's need for it and the trial court's diligent caution in admitting it, will render the evidence admissible. We find this to be such a case.

Appellant next contends the trial court erred in allowing the testimony of an unqualified expert witness. Trooper Leon Krebs testified that the "belt keeper" found at the scene of the crime was part of the belt buckle, belonging to the appellant, found in the sewer. Trooper Krebs testified that his training involved tools and whether they made a certain mark and also determining whether one part of a tool was part of another tool. Appellant contends the belt and "belt keeper" are not tools and therefore his testimony was beyond the scope of his expertise.

The initial question of whether the witness is qualified to testify as an expert is within the sound discretion of the trial court and will not be overturned absent a clear case of abuse of that discretion. *Commonwealth v. Bennett,* 471 Pa. 419, 370 A.2d 373 (1977). We find no abuse of that discretion. Trooper Krebs is a trained criminalist who has made several hundred tool mark identifications and testified in numerous trials. He testified as to his expertise

in determining, "... if broken portions of tools are, in fact, an integral part of another tool ..." (N.T. 201). The witness was qualified to testify and it was a matter for the jury to determine how much weight to give that testimony.

The appellant's next claim of error is that the trial court improperly denied appellant's pre-trial motion to suppress. The appellant attempted to suppress a number of statements made both prior and subsequent to his arrest. In each case it appears from the record that the appellant was fully apprised of his *Miranda* rights. Therefore, in ruling on whether the statements should be suppressed, the court below focussed upon determining whether the statements were voluntary. It determined that the statements were voluntary and denied the appellant's motion to suppress.

In *Commonwealth v. Jackson,* 497 Pa. 591, 442 A.2d 1098 (1982), the Supreme Court held:

> ... In reviewing [the ruling of a suppression court] our initial task is to determine whether the factual findings are supported by the record. In making this determination, we are to consider only the evidence of the prosecution's witnesses and so much evidence of the defense as, fairly read in context of the whole, remains uncontradicted. *Commonwealth v. Goodwin,* 460 Pa. 516, 522, 333 A.2d 892, 895 (1975). If, when so viewed, the evidence supports the factual findings, we are bound by such findings; we may only reverse if the legal conclusions drawn therefrom are in error.

*Id.,* 497 Pa. at 595, 442 A.2d at 1100. It is necessary to analyze the circumstances attending each statement which appellant sought to suppress under the above standard to determine whether the suppression court was correct.

■ The first statement which appellant attempted to suppress resulted when the appellant contacted the probation officer, Patrick McCauley, and asked him to act as an intermediary between appellant and the police on October 11, 1978. The appellant had become aware of the police investigation of Eich's disappearance. A meeting was arranged between appellant and Chief Wells at McCauley's

office. When asked about Eich and the orange Volkswagon, the appellant disclaimed any knowledge of either and stated that he had been picked up hitchhiking by an elderly lady on the night in question, was taken home where he stayed through the next day (see fn. 17, *supra*). The record supports the factual findings of the suppression court and we find no error in its determination the statements were voluntary.

■ The second statement was made on the morning of October 12, 1978. In a routine contact between appellant and McCauley (regarding appellant's employment prospects), the appellant inquired of McCauley the potential penalties for non-disclosure of information regarding crimes. McCauley then gave the required *Miranda* warnings, whereupon the appellant related a second version of the events of October 7 (see f.n. 17 infra). Once again the record supports the suppression court's findings of fact. Moreover, the impetus for this statement was supplied by the appellant himself and not the result of any interrogation. Clearly, there is no dispute that the statement was voluntarily made.

■ The third statement which appellant sought to suppress was his statement previously referred to at the State Police Barracks to the effect that he knew where the body was. Appellant contends that the statement was the result of continued interrogation after appellant had asserted his *Miranda* rights. The court below found that the statement was blurted out by the defendant in the course of general conversation, some concerning Eich, and not as a result of interrogation. The testimony of Trooper Goetz and Chief Wells substantiates this finding (albeit, it is disputed by the appellant). The primary question is therefore whether the general conversation constituted interrogation. The secondary determination is whether the appellant's statement was voluntary.

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) the United States Supreme Court con-

cluded that in the context of "custodial interrogation" certain procedural safeguards are necessary to protect a defendant's privilege against self-incrimination. The Court held that, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.*, at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. The Court also defined "custodial interrogation" as *"questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of freedom in any significant way." *supra* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. Subsequent opinions construing *Miranda* tended to emphasize the custody aspect of the test. However, in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Court expounded upon *Miranda* regarding the interrogation aspect of the test:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the

part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. (emphasis in original) (footnote omitted).

*Id.* at 300–302, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 307–308. In *Innis,* a suspect in the shotgun murder of a taxi driver and the robbery of another driver was captured, sans shotgun, at 4:30 A.M. on a street adjacent to a school for handicapped children. He was given *Miranda* warnings and indicated his desire to speak to an attorney before making any statements. He was then placed in a police vehicle to be transported to the station. En route, one police officer remarked to another that one of the handicapped children might find the shotgun and shells and might injure himself. The suspect told the police to turn around and when they arrived at the scene he led them to the gun. The Supreme Court held that the police officer's comment in the vehicle did not constitute interrogation.

The rule set forth in *Innis* is compatible with the longstanding interpretation of "interrogation" in the Pennsylvania courts. In the seminal case of *Commonwealth v. Simala,* 434 Pa. 219, 226, 252 A.2d 575, 578 (1969) (quoting the Institute of Continuing Legal Education, "Criminal Law and the Constitution—Sources and Commentaries" p. 356 (1968)), the Supreme Court defined interrogation as "not simply custody plus 'questioning' as such, which calls for the *Miranda* safeguards but custody plus police *conduct* ... calculated to, expected to, or likely to, evoke admissions." (emphasis in original). See also *Commonwealth v. Lowenberg,* 481 Pa. 244, 392 A.2d 1274 (1978); *Commonwealth v. Boone,* 467 Pa. 168, 354 A.2d 898 (1975); *Commonwealth v. Yount,* 455 Pa. 303, 314 A.2d 242 (1974).

Based on the findings of fact and considering the standards as enunciated by our Supreme Court and by the United States Supreme Court, we find the general conversation taking place in the state police barracks did not constitute interrogation. The appellant was at the barracks only in order to make a statement regarding Darryl Carter throwing objects into the sewer. The parties were awaiting

the arrival of a stenographer to take appellant's statement. It is not at all unusual that the police officers would be talking about the Eich investigation (at that time a missing persons investigation). In light of these facts we cannot that conclude the suppression court was in error.

■ Moreover, in *Commonwealth v. Mercier*, 451 Pa. 211, 302 A.2d 337 (1973), the court held that the Commonwealth has the burden of proving that a suspect, after exercising his privilege, has changed his mind voluntarily without being threatened, tricked or cajoled. The court below found as a fact that there was no trickery, threats or cajolery. We find this to be supported by the record. *Commonwealth v. Jackson, supra.*

■ The fourth statement appellant sought to suppress was a taped, later transcribed, statement made at approximately 10:30 P.M. on October 12, 1978, subsequent to appellant's arrest and arraignment. Appellant was given *Miranda* warnings and he indicated his understanding of his rights and his willingness to make a statement. Based on the written transcript of the taped statement which was signed by the appellant and also initialed on each page, we find the suppression court was correct in determining that the statement was knowingly, voluntarily and intelligently made. *Commonwealth v. Mercier, supra.*

■ The final statement at issue in the suppression proceeding was the taped statement made by appellant to Patrick McCauley and Frank Dougherty on October 18, 1978 at Berks County Prison. The interview was arranged at the appellant's request. He was again issued *Miranda* warnings and indicated he did not wish to have an attorney present. He then gave a detailed account of his version of the events of October 7, 1978, similar to the taped statement given to Trooper Barry Pease and to his testimony at trial. Furthermore, at the end of the interview the appellant was told that the tapes might be transcribed and turned over to the district attorney. At this time the appellant said, "Anything to keep me from goin' to jail."

Once again, the record amply supports the suppression court's finding that the statements were voluntary. In sum, we find no error in the refusal of the court below to suppress any of the appellant's statements.

 Appellant's next claim is that the trial court erred in refusing to grant his demurrer to the Commonwealth's evidence. This issue was waived when appellant elected to put on a defense. *Commonwealth v. Dussinger*, 478 Pa. 182, 386 A.2d 500 (1978); *Commonwealth v. Ilgenfritz*, 466 Pa. 345, 353 A.2d 387 (1976). However, "we will treat the question as if properly framed, namely, whether the trial court erred in refusing defendant's motion in arrest of judgment," *Id.*, 478 Pa. at 347, 353 A.2d at 388. We are addressing appellant's insufficiency claim in any event.

This brings us to the appellant's final claim that the evidence was insufficient to support the verdict. In reviewing a claim of insufficiency this court determines:

> Whether, accepting as true all the evidence and all [the] reasonable inference therefrom upon which if believed the [finder of fact] could have properly based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime or crimes for which he has been convicted. *Commonwealth v. Bayard*, 453 Pa. 506, 509, 309 A.2d 579, 581 (1973); *Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837 (1973). In this regard it must be noted that the finder of fact has the right to reject part or all of the [witness'] testimony even if uncontradicted. *Commonwealth v. Chermansky*, 430 Pa. 170 at 174, 242 A.2d 237 at 240 [ (1968) ].

*Commonwealth v. Waller*, 498 Pa. 33, 43, 444 A.2d 653, 658 (1982) (quoting *Commonwealth v. Young*, 494 Pa. 224, 228, 431 A.2d 230, 232 (1981)).

The court in *Waller* went on to state:

> Furthermore, while it is clear that a criminal conviction may not be based upon mere surmise or conjecture, the Commonwealth's burden in proving a criminal offense or

the elements thereof may be sustained by means of wholly circumstantial evidence.

*Commonwealth v. Waller, supra,* 498 Pa. at 43, 444 A.2d at 658 (quoting *Commonwealth v. Thomas,* 465 Pa. 442 at 446–47, 350 A.2d 847 at 849 (1976)).

 It is uncontradicted that the appellant was at the scene where the crimes were committed. The jury was entitled to disbelieve the appellant's exculpatory story that he was asleep in the Volkswagen. *Commonwealth v. Chermansky, supra.* The appellant's presence in conjunction with the other evidence connecting him with the crimes is sufficient to sustain all of the convictions.

Appellant's most serious conviction was for the crime of murder in the second degree which is defined by 18 Pa.C. S.A. § 2502(b) as, "[A] criminal homicide ... committed while defendant was engaged as a principal or accomplice in the perpetration of a felony."

'Perpetration of a felony' is defined in subsection (d) as, "The act of the defendant in engaging in or being an accomplice in the commission of ... robbery rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." A criminal homicide occurs when "[A] person ... intentionally, knowingly, recklessly, or negligently causes the death of a human being." 18 Pa.C.S.A. § 2501(a).

 It is evident that a criminal homicide has taken place. The Commonwealth's evidence clearly demonstrated the savage beating which resulted in the death. The appellant was linked to the beating by the use of his belt as a ligature around the victim's neck, the belt "keeper" found close to the body, and the beer bottle and cardboard holders on which were found appellant's fingerprints. Moreover, scratches found on the appellant's hands were similar to those found on the hands of the State Trooper who discovered the body. The evidence, although circumstantial, is sufficient to support a finding that appellant was present not only in the vehicle, but back in the weeds where the

body was found. It is not clear whether the beating was administered by the appellant, by Darryl Carter, or by both. However, it is only necessary for the Commonwealth to prove appellant's participation as an accomplice. We find that the Commonwealth has done so. In addition to the above-enumerated connecting facts there is the added fact that the appellant accompanied Carter on an excursion destined for California, although it progressed only as far as Illinois.

The last element which the Commonwealth needed to prove was that the criminal homicide took place in the course of one of the enumerated felonies. Of these felonies, appellant was convicted of rape, involuntary deviate sexual intercourse and robbery. We find the evidence sufficient to sustain all three convictions and, thus find that the conviction for second degree murder was proper.

▇▇▇ Rape is defined in 18 Pa.C.S.A. § 3121:

§ 3121. Rape.

A person commits a felony of the first degree when he engages in sexual intercourse with another person not his spouse:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(3) who is unconscious; or

(4) who is so mentally deranged or deficient that such person is incapable of consent.

The Commonwealth produced the testimony of the coroner who examined the body of the victim. He testified that the victim's anus had been penetrated by an object consistent with a penis. The brutal beating provides all the evidence necessary to prove forcible compulsion. We find the evidence of rape by forcible compulsion was sufficient. *Commonwealth v. Perrin*, 484 Pa. 188, 398 A.2d 1007 (1979). Once again it is not clear whether Carter or the appellant effected penetration. However, an accomplice is as culpable as a principal. 18 Pa.C.S.A. § 306(d).

The same analysis holds true with regard to appellant's conviction for involuntary deviate sexual intercourse as defined by 18 Pa.C.S.A. § 3123. We do not find any further discussion necessary. We find the evidence was sufficient. The same also holds true with regard to appellant's conviction for indecent assault under 18 Pa.C.S.A. § 3126.

■■■ However, the same act constitutes the basis for all three convictions. Consequently, we find that the three offenses merge. It is well established that a conviction for indecent assault will merge into a conviction for rape. *Commonwealth v. Brown*, 290 Pa.Super. 448, 434 A.2d 838 (1981). However, for the most part, rape and involuntary deviate sexual intercourse will constitute separate offenses. In the present case, only one act was committed, and it is this act which serves as the basis for both convictions. Under these circumstances we would find the two offenses merge. *Commonwealth v. Artis*, 294 Pa.Super. 276, 439 A.2d 1199 (1982). The rape conviction must merge into the involuntary deviate sexual intercourse conviction because the latter contains an additional element; *i.e.*, sexual intercourse *per os* or *per anus*. But *c.f. Commonwealth v. Pifer*, 284 Pa.Super. 170, 425 A.2d 757 (1981); *Commonwealth v. Johnson*, 274 Pa.Super. 440, 418 A.2d 487 (1980). Thus, the sentences for rape and indecent assault must be vacated.

■■■ The appellant was also convicted of robbery under 18 Pa.C.S.A. § 3701, which states:

§ 3701. Robbery

(a) Offense defined.—

(1) A person is guilty of robbery if, in the course of committing a theft, he:

(i) inflicts serious bodily injury upon another;

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury; or

(iii) commits or threatens immediately to commit any felony of the first or second degree,

(2) An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission.

(b) Grading.—Robbery is a felony of the first degree. A person is guilty of "theft" under 18 Pa.C.S.A. § 3921(a) if "he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." Two items were taken from the victim: the wallet and the Volkswagen. We find the evidence sufficient to sustain a finding that appellant was guilty of robbery with regard to the Volkswagen. The theft is established by the fact that Carter and the appellant took the Volkswagen after the slaying of the victim. The infliction of serious bodily injury is evident in this case. The appellant's participation in the robbery is further corroborated by his continued accompaniment of Carter and the use and enjoyment of the vehicle during their trip to Illinois. Moreover, the appellant eventually sold the vehicle to the hitchhiker. The convictions for robbery and theft must be sustained. However, the offenses merge for purposes of sentencing, *Commonwealth v. Turner*, 265 Pa.Super. 486, 402 A.2d 542 (1979), and therefore the sentence for theft must be vacated.

Finally, we find sufficient evidence to sustain the appellant's conviction for conspiracy. 18 Pa.C.S.A. § 903. Although circumstantial, the evidence demonstrates an inference that the appellant and Carter planned the robbery of the victim. *Commonwealth v. Finnegan*, 280 Pa.Super. 584, 421 A.2d 1086 (1980). The evidence demonstrates that the appellant accompanied Carter and the victim to a deserted area, despite his explanation that he was merely being given a ride to his home. Furthermore, the evidence demonstrates the appellant's participation in the crime and in sharing the spoils of the crime. This conviction must also be sustained.

In accordance with the above, we affirm the judgment of sentence of the trial court with regard to murder in the second degree, involuntary deviate sexual intercourse, rob-

bery and conspiracy. We vacate the judgment of sentence with regard to rape, indecent assault and theft.

Affirmed in part and vacated in part.